IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARILYNN STACEY-SUGGS, | |
| Plaintiff, | CIVIL ACTION FILE NO. |
| v. | 1:12-CV-3339-RWS-JFK |
| THE BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, d/b/a Savannah State University, and CHERYL DAVENPORT DOZIER, in her official capacity as President of Savannah State University and in her individual capacity, | |
| Defendants. | |

**FINAL REPORT AND RECOMMENDATION**

Plaintiff Marilynn Stacey-Suggs filed the above-styled employment discrimination action against Defendant Board of Regents and Cheryl Dozier in September 2012. [Doc. 1]. Plaintiff alleges that the Board of Regents subjected her to sexual discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* [Doc. 1, Counts I, II]. Plaintiff asserts that Defendant Dozier, in her individual capacity, subjected her to sexual discrimination in violation of the Equal Protection Clause of the Fourteenth

AO 72A
(Rev.8/82)

Amendment to the United States Constitution.[1]  [Doc. 1, Count III].  Plaintiff seeks declaratory and injunctive relief against the Board of Regents and Dozier in her individual and official capacities.  [Doc. 1, Counts IV, V].  Plaintiff also brings a sexual discrimination claim against both Defendants pursuant to the Equal Pay Act, 29 U.S.C. § 206, *et seq.*  [Doc. 1, Count VI].  Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Plaintiff's claims based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted to the court.  [Doc. 27].

## I.    Facts

When evaluating the merits of a motion for summary judgment, the court must "view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party."  Comer v. City of Palm Bay, Florida, 265 F.3d 1186, 1192 (11th Cir. 2001).  However, mere conclusions and unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment.  See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005).  Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing

---

[1]Plaintiff's Equal Protection claim is brought pursuant to 42 U.S.C. § 1983.

AO 72A
(Rev.8/8 2)

principles, the following facts are deemed to be true for the limited purpose of evaluating Defendants' motion [Doc. 27] for summary judgment.

Plaintiff Marilynn Stacey-Suggs earned a degree in business administration in 1980 and a degree in funeral services in 1983. [Defendants' Statement of Material Facts ("DSMF") ¶ 1]. Plaintiff began working at Savannah State University ("SSU") in 1989 and held varying roles of increasing responsibility throughout her employment. [Plaintiff's Statement of Material Facts ("PSMF") ¶ 2]. In 1996, as Senior Secretary, Plaintiff's duties included arranging for transportation for SSU's athletic teams. This was Plaintiff's first involvement with SSU's Athletic Department. [PSMF ¶ 3]. Plaintiff was appointed Senior Woman Administrator ("SWA") in 2004 and held that designation until 2006. [PSMF ¶ 4; DSMF ¶ 2; Plaintiff's Deposition ("Pla. Dep.") at 23, 28-31, Exhibit ("Ex.") 1]. SSU required that Plaintiff spend only 20% of her time performing the Senior Woman Administrator role and the remaining 80% performing her job as telecommunications coordinator. [DSMF ¶ 3; Plaintiff's Response ("Pla. Resp.") to DSMF ¶ 3].

Plaintiff held her first full time position in the Athletic Department in 2008 when she became Assistant Athletic Director ("AD") for Academic Services. [DSMF ¶ 4]. In December 2009, Plaintiff was appointed interim AD. She was appointed permanent

3

AD in December 2010, effective January 2011.  [PSMF ¶ 6].  Plaintiff was the first female to serve as permanent AD at SSU.  [PSMF ¶¶ 6, 7].  Plaintiff's offer letter conditioned her acceptance of the AD job on her agreeing to have a mentor from another Division I school, specifying that the mentor should be assigned "confidentially."  [PSMF ¶ 22].  Plaintiff's salary as AD was set at $90,000 on December 8, 2010, by the President at the time, Dr. Earl Yarbrough.  [DSMF ¶ 6].

In May 2011, Dr. Cheryl Dozier was appointed interim President of SSU. [Dozier Dep. at 11-13; PSMF ¶ 8].  Soon after joining SSU, Dozier reached out to a former University of Georgia colleague, Arthur Johnson, about her concerns with the Athletic Department, specifically compliance.  Johnson suggested to Dozier that she contact Damon Evans, UGA's former AD.  [DSMF ¶ 9].  Dozier subsequently hired Evans as a consultant for SSU's Athletic Department without consulting with Plaintiff, who was AD at the time.  [PSMF ¶ 30].

At the time of Dozier's appointment, SSU was transitioning to permanent membership in the Mid-Eastern Athletic Conference ("MEAC"), a Division I athletic conference.  [PSMF ¶¶ 10, 15; DSMF ¶ 8; Pla. Dep. at 124, Ex. 17].  The MEAC had extended provisional membership to SSU in 2010.  [PSMF ¶ 10; Pla. Dep. at 124, Ex. 17].  SSU's offer of permanent membership into the MEAC was dependant on the

4

university being in compliance with three specific stipulations, one of which required an athletic budget of at least $8 million dollars by September 1, 2011.[2]  [DSMF ¶ 8; Pla. Dep. at 124, Ex. 17].

The first conversation between Plaintiff Suggs and President Dozier took place in a meeting on May 11, 2011.  In this conversation, Dozier stated that her husband was the expert on athletics in their family, and she asked Plaintiff why she would choose a career in athletics.  [PSMF ¶¶ 9, 29; DSMF ¶ 10; Pla. Dep. at 261; Dozier Dep. at 67-68].  Dozier said that she would be relying on Plaintiff to provide the information that Dozier needed to make decisions about the Athletic Department.  [DSMF ¶ 11].  Dozier testified that during the May 11 meeting, Plaintiff indicated that there had not been much fundraising.  [Dozier Dep. at 62-64].  Plaintiff raised only about $30,000 while she worked as the AD, and no businesses made contributions to the Athletic Department.  [Pla. Dep. at 102-04].  According to Dozier, Plaintiff also said that the Athletic Department had not met the $8 million dollar budget requirement

---

[2]The other two stipulations related to the amount of scholarships and the size of the football coaching staff.  [PSMF ¶ 16; Pla. Dep. at 124, Ex. 17].  The $8 million dollar budget amount was the average athletic budget for football playing institutions in the MEAC.  [Pla. Dep. at 124, Ex. 17].

AO 72A

(Rev.8/8
2)

necessary for permanent membership in the MEAC.  [DSMF ¶ 8; Pla. Dep. at 124, Ex. 17; Dozier Dep. at 62-64].

Dozier testified that during a meeting with Plaintiff a little more than a week later, on May 20, 2011, Dozier instructed Plaintiff to provide her with, *inter alia*, a draft response that contained the status of SSU's compliance with the three criteria required by the MEAC.  [Dozier Dep. at 50-53; Pla. Dep. at 113-14, Ex. 15].  Dozier stated that she instructed Plaintiff to provide her with the draft response by Monday, May 23, because she was meeting with the MEAC on Friday, May 27.  [Dozier Dep. at 50-53; Pla. Dep. at 115].  Plaintiff did not provide the response until 11:23 p.m. on Tuesday, May 24, after Dozier emailed Plaintiff asking for the materials.  [Dozier Dep. at 50-53; Pla. Dep. at 113-14, Ex. 15].

Dozier testified that when she arrived at the MEAC meeting on May 27, she was stunned to learn that Plaintiff had a mentor, Marty Miller, who was an AD from a competing MEAC university.  [Dozier Dep. at 201-03; Pla. Dep. at 115].  Dozier learned from Miller that he had helped Plaintiff as she assisted Dozier in preparing for the MEAC meeting.  [Dozier Dep. at 201-03].  Dozier testified:

> How could he know and why did he know what I was asking her for to prepare me for a meeting?  To me it – by the time I went there I've had two one-on-one meetings and I had seen Miss Suggs.  She had been in my

6

>presence a lot and she never informed me.  That's a level of trust . . . .  I felt that if somebody else was doing the work that I asked you to do you should have told me.

[Dozier Dep. at 202].  Dozier stated that after these incidents, she did not feel that she could trust Plaintiff.  [Dozier Dep. at 205, 209-10].

On June 17, 2011, Plaintiff and Dozier met with the Commissioner of the MEAC.  [PSMF ¶ 10].  Plaintiff testified that as of June 17, SSU was in compliance with the MEAC budget requirements.  A contemporaneous report prepared by Plaintiff stated that SSU was in compliance.  [PSMF ¶ 17; Pla. Dep. at 124-28, Ex. 17].

On July 5, 2011, Dozier informed Plaintiff that she had been terminated from her position as AD.  This was the final conversation between Plaintiff and Dozier.  [PSMF ¶ 11].  Dozier decided independently to terminate Plaintiff.  [DSMF ¶ 23].  Dozier did not welcome or seek input from other members of SSU's faculty or staff regarding Plaintiff's job performance or history.  [PSMF ¶ 28].  Dozier testified that she terminated Plaintiff's employment as AD because she did not feel that she could trust Plaintiff and because Plaintiff allegedly did not posses the "leadership skills, administrative skills, budgeting skills, fundraising skills [and] the know how of interacting" that were necessary for the AD position.  [Dozier Dep. at 46-47, 209-10].  When Plaintiff was terminated as AD in July 2011, she had less than three years of

AO 72A
(Rev.8/8
2)

experience working full time in athletics.  [DSMF ¶ 5].  Dozier appointed basketball coach Horace Broadnax as interim AD following Plaintiff's termination, even though she conceded that as a coach, he probably didn't even "know what the job of athletic director is."  [PSMF ¶ 31].

Approximately a day after Plaintiff's termination, Dr. Irvin Clark, Vice President of Student Affairs, created a position for Plaintiff called Associate Director of Student Development ("ADSD").  [DSMF ¶ 36].  President Dozier knew nothing about the ADSD position except that it was in Student Affairs.  [DSMF ¶ 37].  Plaintiff began working as ADSD on July 14, 2011.  A few days later, Plaintiff looked at her personnel file and found that the Recommendation for Employment form classified her ADSD position as "temporary."  [Pla. Dep. at 174-77].  Plaintiff testified that a human resources employee informed her that a job classified as "temporary" but with no ending date "can just go on."  [Pla. Dep. at 182-183, 187, Ex. 20].  Plaintiff also testified that, although she retained benefits as ADSD, temporary jobs do not have benefits.  [PSMF ¶ 48; Id.].

President Dozier and Edward Jolley, Vice President of Business and Finance, determined the salary range that would be offered to a prospective replacement AD. Dozier and Jolley made this determination by looking at what SSU could afford and

8

what other schools in the MEAC were paying their ADs.  [DSMF ¶ 27].  Dozier and Jolley set the salary range for the new AD at $105,000.00 to $115,000.00.[3]  [DSMF ¶ 28].  The salary range was decided before any applications for the position were received and before any candidates were selected for interviews.  [DSMF ¶ 29].

Jolley chaired the search committee of twelve members, including five women. [DSMF ¶ 31].  Before the search process began, Dozier instructed Jolley to ensure that females were considered for the AD position.  [DSMF ¶ 32].  The search committee presented Dozier with the finalists for the AD position, and Dozier interviewed each of them.  [Dozier Dep. at 102-15].  Dozier's first choice for the AD position was Ricardo Hooper.  [Dozier Dec. ¶ 6, Ex. 2; Doc. 27 at 10].  Dozier testified, however, that Hooper was unavailable until 2012, so she offered the AD position to Sterling Steward, who was her second choice.  [Dozier Dec. ¶ 6; Dozier Dep., Ex. 13].  Steward had significantly more experience in college athletics than Plaintiff and had worked as an interim AD/associate AD for compliance from September 2009 to July 2010 for Alabama State University, a Division I athletics program.  [Pla. Dep. at 244-45; Dozier

---

[3] Before setting the salary range of the AD position, Jolley advised Dozier that SSU was previously unable to hire its first choice for AD in connection with the search in 2010 because SSU could not meet the candidate's salary requirement.  [DSMF ¶ 30].

AO 72A

(Rev.8/8 2)

Dep. at 110-13, Ex. 13].  Dozier allegedly told Plaintiff at the time of her termination that Dozier "need[ed] an athletic director with more Division I experience," but Steward had less Division I experience than Plaintiff.  [Pla. Dep. at 136; Dozier Dep. at 108, 111].

On December 27, 2011, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  [DSMF ¶ 39; Pla. Dep. at 191, Ex. 21].  Plaintiff alleged in the charge that she had been subjected to sexual discrimination when she was terminated from her AD position on July 5, 2011.  [Pla. Dep. at 191, Ex. 21].  Plaintiff also asserted that Steward was being paid approximately $125,000 as AD, while she was paid approximately $90,000 as AD and was only making around $50,000 as ADSD.  [Id.].

Plaintiff testified that in or around March 2012, her supervisor, Jacqueline Awe, informed her that her position as ADSD was classified as "interim."  [Pla. Dep. at 193; DSMF ¶ 40].  In April 2012, Plaintiff was given a six-month performance evaluation as ADSD.  [PSMF ¶ 49].  The evaluation did not indicate that her position was "interim," and it referenced goals "for the next academic year."  [PSMF ¶ 50].

On June 18, 2012, Awe sent Plaintiff an e-mail stating: "[I]t has come to my attention . . . that your name is among the list of personnel who currently hold interim

10

positions on our campus . . . .  Your position . . . is documented as interim and as a result, I will be initiating a search process to begin shortly . . . ."  [PSMF ¶ 51; Dozier Dep. at 175, Ex. 24].  Awe informed Plaintiff that the search process was necessary to comply with a Board of Regents policy stating that interim positions shall normally be for no more than twelve months.  [DSMF ¶ 41].  Six other employees, five of whom were male, were also classified as interim and subject to the search process.  [DSMF ¶ 42].  Dr. Sandra Best, Director of Human Resources, prepared the list in the course of her duties as HR Director and not at the direction of either President Dozier or Dr. Irvin Clark, Vice President of Student Affairs.  Best provided the list to Clark who then provided it to Awe.  [DSMF ¶ 43].

On July 12, 2012, Plaintiff filed a second charge of discrimination with the EEOC.  Plaintiff alleged that she had been subjected to retaliation on June 18, 2012, when she "was informed for the first time by SSU that it considers [her] current position an 'interim' position."  [Pla. Dep. at 206, Ex. 23; DSMF ¶ 44].  Plaintiff also asserted, "I was never told that this was an interim position, and I believe SSU has designated it as such in retaliation for my complaint of discrimination."  [Pla. Dep. at 206, Ex. 23].  Plaintiff served as ADSD for a year and a half, from July 2011 until

AO 72A

(Rev.8/8 2)

January 2013.  [PSMF ¶ 58].  Plaintiff's last day of employment at SSU was January 28, 2013.  [PSMF ¶ 60].  A male was chosen as permanent ADSD.  [PSMF ¶ 59].

Additional facts will be set forth as necessary during discussion of Defendants' motion for summary judgment.

## II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (amended 2010).  Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  See Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986).

The movant bears the initial burden of asserting the basis of his motion, and that burden is a light one.  See Celotex, 106 S. Ct. at 2553.  The movant is not required to

AO 72A

(Rev.8/8

2)

negate his opponent's claim.  See id.  Rather, the movant may discharge this burden

merely by "'showing' - that is, pointing out to the district court - that there is an

absence of evidence to support the nonmoving party's case."  Id. at 2554.

When evaluating a motion for summary judgment, the court must view the

evidence and factual inferences in the light most favorable to the nonmoving party.

See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1309 (11th Cir. 2001).

However, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v.

Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).  Instead, "the nonmoving party must

present evidence beyond the pleadings showing that a reasonable jury could find in its

favor."  Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing Walker

v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)).

The court will apply these standards in ruling on the motion for summary

judgment.

## III.   Discussion

### A.   Equal Pay Act Claim

In her complaint, Plaintiff Suggs asserted a claim against Defendant Board of

Regents based on the Equal Pay Act.  [Doc. 1, Count VI].  However, after Defendants

13

moved for summary judgment, Plaintiff notified the court that "she does not oppose the granting of Defendants' Motion as to that claim, or her corresponding claim for injunctive relief." [Doc. 38 at 2 n.1]. The undersigned, therefore, **RECOMMENDS** that Defendants' motion [Doc. 27] for summary judgment be **GRANTED** on Plaintiff's Equal Pay Act claim.

### B.    Sexual Discrimination Claims

Plaintiff Suggs alleges in Count I of her complaint that Defendant Board of Regents violated Title VII by subjecting her to gender/sexual discrimination. [Doc. 1 at 14-15]. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). In Count III, Plaintiff brings a sexual discrimination claim against Defendant Cheryl Dozier in her individual capacity based on the Equal Protection Clause. [Doc. 1 at 17-18]. Plaintiff's Equal Protection claim is brought pursuant to 42 U.S.C. § 1983, which provides, in pertinent part: "Every person who, under color of any statute . . . of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law. . . ." 42 U.S.C. § 1983. Section 1983 "is not

14

itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." <u>Baker v. McCollan</u>, 99 S. Ct. 2689, 2694 n.3 (1979). Because sexual discrimination claims brought under the Equal Protection Clause via § 1983 and Title VII are subject to the same standards of proof and employ the same analytical framework, the court will refer solely to Title VII with the understanding that the analysis applies to both of Plaintiff's claims. <u>See</u> <u>Bryant v. Jones</u>, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009); <u>Cross v. State of Alabama, State Dep't of Mental Health & Mental Retardation</u>, 49 F.3d 1490, 1507-08 (11th Cir. 1995). Plaintiff alleges that Defendants subjected her to sexual discrimination by terminating her employment as Athletic Director ("AD") and placing her in a less prestigious, lower-paying position. [Doc. 1 at 14-15, 17-18; Doc. 38 at 13-16].

In a disparate treatment action, the plaintiff carries the burden of demonstrating that the defendant has unlawfully discriminated against her. <u>See</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 101 S. Ct. 1089, 1093-95 (1981). "A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof." <u>Rioux v. City of Atlanta, Georgia</u>, 520 F.3d 1269, 1274 (11th Cir. 2008). Because Plaintiff relies on circumstantial evidence, the

AO 72A

(Rev.8/8 2)

court will use the framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 93 S.

Ct. 1817, 1824-25 (1973), to evaluate her claim.  Under this framework, the allocation

of burdens and order of presentation and proof are as follows: (1) the plaintiff has the

burden of proving a *prima facie* case of discrimination; (2) if the plaintiff succeeds in

proving the *prima facie* case, the burden (of production) shifts to the defendant to

articulate some legitimate, nondiscriminatory reason for the action taken against the

employee; and (3) should the defendant carry this burden, the plaintiff must have an

opportunity to prove that the legitimate reason offered by defendant was a pretext for

discrimination.  <u>See</u> <u>id.</u>

Defendants acknowledge that Plaintiff is able to establish a *prima facie* case of

sexual discrimination.  [Doc. 27 at 16].  As a result, Defendants must offer a legitimate,

nondiscriminatory reason for terminating Plaintiff's employment as AD.  <u>See</u> <u>Combs</u>

<u>v. Plantation Patterns</u>, 106 F. 3d 1519, 1528 (11th Cir. 1997) (citing <u>McDonnell</u>

<u>Douglas</u>, 93 S. Ct. at 1824; <u>Burdine</u>, 101 S. Ct. at 1094).   "'[T]o satisfy this

intermediate burden, the employer need only produce admissible evidence which

would allow the trier of fact rationally to conclude that the employment decision had

*not* been motivated by discriminatory animus.'"  <u>Id.</u> (quoting <u>Burdine</u>, 101 S. Ct. at

1096) (emphasis in original).  A "'defendant need not persuade the court that it was

16

actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'"  Id. (quoting Burdine, 101 S. Ct. at 1094).  The defendant's burden in the rebuttal stage is "'exceedingly light.'"  Walker v. NationsBank of Florida N.A., 53 F.3d 1548, 1556 (11th Cir. 1995) (quoting Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983)).

President Cheryl Dozier asserts that she made the decision to terminate Plaintiff Suggs' employment as AD because she did not feel that she could trust Plaintiff and because Plaintiff allegedly did not posses the "leadership skills, administrative skills, budgeting skills, fundraising skills [and] the know how of interacting" that were necessary for the AD position.  [Doc. 27 at 17-18; Dozier Dep. at 209-10].  At the time of Dozier's appointment as President, SSU was transitioning to permanent membership in the MEAC, a Division I athletic conference.  [PSMF ¶ 10; DSMF ¶ 8; Pla. Dep. at 124, Ex. 17].  When Dozier was asked about the termination decision, she testified:

> I wanted a different person who I felt that would be able to – that had a better understanding of athletics administration, leadership, et cetera . . . .  I was not satisfied with Miss Suggs' . . . ability to lead.  From our meetings, from what I've asked of her, from her knowledge base, from what I knew, from the persons that I spoke to regarding what was needed in that position, I did not feel Miss Suggs had the education, the

17

knowledge, the skills or the ability to lead the next wave of athletics as we
entered into a conference level.

[Dozier Dep. at 46-47].  Dozier also stated: "Persons I talked to would say what will get you in trouble is not having compliance and not having the money to run the program.  Miss Suggs did not have the compliance experience . . . .  And Miss Suggs had not had the budgetary experience nor was she raising the money that was needed to be in the MEAC."  [Dozier Dep. at 48].

Dozier testified that during her first meeting with Plaintiff on May 11, 2011, Plaintiff indicated that there had not been much fundraising.  And although SSU's offer of permanent membership into the MEAC was dependant on the university having an athletic budget of at least $8 million dollars by September 1, 2011, Plaintiff allegedly informed Dozier that the Athletic Department had not met the budget requirement.  [DSMF ¶ 8; Pla. Dep. at 124, Ex. 17; Dozier Dep. at 62-64].  According to Dozier, during a meeting with Plaintiff on May 20, 2011, Dozier instructed Plaintiff to provide her with, *inter alia*, a draft response that contained the status of SSU's compliance with the criteria required by the MEAC.[4]  [Dozier Dep. at 50-53; Pla. Dep. at 113-14, Ex. 15].  Dozier stated that she instructed Plaintiff to provide her with the draft response

---

[4]The other stipulations related to the amount of scholarships and the size of the football coaching staff.  [PSMF ¶ 16; Pla. Dep. at 124, Ex. 17].

18

AO 72A

(Rev.8/8
2)

by Monday, May 23, because she was meeting with the MEAC on Friday, May 27.
[Dozier Dep. at 50-53; Pla. Dep. at 115].  Plaintiff did not provide the response until
11:23 p.m. on Tuesday, May 24, after Dozier emailed Plaintiff asking for the materials.
[Dozier Dep. at 50-53; Pla. Dep. at 113-14, Ex. 15].

Dozier stated that when she arrived at the MEAC meeting on May 27, she was
stunned to learn that Plaintiff had a mentor, Marty Miller, who was an AD from a
competing MEAC university.  [Dozier Dep. at 201-03; Pla. Dep. at 115].  Dozier
learned from Miller that he had helped Plaintiff as she assisted Dozier in preparing for
the MEAC meeting.  [Dozier Dep. at 201-03].  Dozier testified:

> How could he know and why did he know what I was asking her for to
> prepare me for a meeting?  To me it – by the time I went there I've had
> two one-on-one meetings and I had seen Miss Suggs.  She had been in my
> presence a lot and she never informed me.  That's a level of trust . . . .  I
> felt that if somebody else was doing the work that I asked you to do you
> should have told me.

[Dozier Dep. at 202].  Dozier stated that after these incidents, she did not feel that she
could trust Plaintiff.  According to Dozier, this lack of trust contributed to her decision
to remove Plaintiff from the AD position.  [Dozier Dep. at 205, 209-10].  And as noted
*supra*, Dozier also cited Plaintiff's alleged lack of "leadership skills, administrative
skills, budgeting skills, fundraising skills [and] the know how of interacting" that were

AO 72A
(Rev.8/8
2)

necessary for the AD position.  [Id.].  The court finds that Defendants have easily satisfied their light burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff's employment as AD.

Once a defendant meets its burden of production, "the presumption of discrimination created by the McDonnell Douglas framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'" Combs, 106 F.3d at 1528 (quoting Burdine, 101 S. Ct. at 1094-95 & n.10).  The plaintiff then "has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997) (citing McDonnell Douglas, 93 S. Ct. at 1825).  Plaintiff's demonstration of pretext merges with her "ultimate burden of showing that the defendant intentionally discriminated against the plaintiff." Holifield, 115 F.3d at 1565 (citing St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742, 2749 (1993)).  This task is a highly focused one.

The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct[.]'" Combs, 106 F.3d at 1538 (quoting

20

Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994)). Plaintiff "'may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Jackson v. State of Alabama State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting Burdine, 101 S. Ct. at 1095).

Plaintiff argues that Dozier's proffered reasons are pretexts for unlawful discrimination. With regard to budgeting and fundraising, Dozier testified that during her first meeting with Plaintiff on May 11, 2011, Plaintiff indicated that there had not been much fundraising and that the Athletic Department had not met the $8 million dollar budget requirement necessary to become a full member of the MEAC.[5] [Dozier Dep. at 62-64]. Plaintiff argues that this reason could be found to be pretextual because a report prepared by Plaintiff on June 17, 2011, showed that SSU was in

_____

[5]Although Plaintiff claims that "Dozier purportedly terminated Suggs because of the deficit" in the budget, the record evidence does not support this assertion. [Doc. 38 at 14]. Dozier testified that when she met with Plaintiff in May 2011, she was aware that the Athletic Department had a deficit. However, Dozier did not testify that she fired Plaintiff because of the deficit. [Dozier Dep. at 62-65]. Dozier stated that she terminated Plaintiff's employment as AD because she felt that she could not trust Plaintiff and because Plaintiff did not possess the necessary skills in terms of leadership, administration, budgeting, and fundraising. [Dozier Dep. at 46-53, 201-10].

AO 72A
(Rev.8/8
2)

compliance with the budget requirements.  [PSMF ¶ 17; Pla. Dep. at 124-28, Ex. 17; Doc. 38 at 5, 14].  Plaintiff argues that it is not credible to believe that just one month earlier, Plaintiff would have informed Dozier that the budget requirements had not been met.  [Doc. 38 at 14].  The deficiency in Plaintiff's argument is that there is no evidence rebutting Dozier's testimony that she was informed in early May 2011 that the $8 million dollar budget requirement had not been met.  Furthermore, Plaintiff has offered nothing which contradicts Dozier's assertion that Plaintiff had done little fundraising and that she lacked the fundraising skills necessary for an AD.  [Dozier Dep. at 62, 205, 209-10].  In fact, Plaintiff's own testimony confirms that she raised only about $30,000 while she worked as the AD and that no businesses made contributions to the Athletic Department.[6]  [Pla. Dep. at 102-04].  These facts undermine Plaintiff's pretext argument.

As discussed *supra*, Dozier claims that Plaintiff also failed to provide her with materials in preparation for a MEAC meeting by May 23, 2011, as Dozier had requested, and that Plaintiff only submitted it at 11:23 p.m. on May 24 after Dozier had

---

[6]Plaintiff argues that she testified that she raised "in excess of $30,000" as AD, not that she raised only $30,000.  [Doc. 38 at 6].  This is not persuasive.  It is clear from Plaintiff's deposition that she stated that the amount she raised was approximately $30,000.  [Pla. Dep. at 102-04].

reminded her.  [Dozier Dep. at 50-53; Pla. Dep. at 113-14, Ex. 15].  Plaintiff testified that she did not recall missing the deadline, but she believes that based on the email exchange that she had with Dozier on May 24, she had already sent the requested documents.  [Pla. Dep. at 114-20, Ex. 15; Doc. 38 at 6, 13-14].  Plaintiff notes that in the email she wrote, "I will send previously submitted documents under separate cover."  [Pla. Dep. at 117-18, Ex. 15; Doc. 38 at 6, 13-14].  Plaintiff argues that a reasonable jury could find that she did not miss the deadline as Dozier alleges.  [Doc. 38 at 13-14].  Plaintiff also contends that "the extraordinary leap in logic between Suggs' supposed failure to meet a deadline and Dozier's conclusion she was unfit for her job . . . raises an inference that Dozier fabricated or overstated the significance of this to disguise sinister motives."  [Doc. 38 at 13-14].

The deposition testimony from Plaintiff on this issue is confusing.  At the time of her deposition, Plaintiff stated that she did not recall meeting with Dozier on May 20, 2011, or missing the May 23rd deadline.  [Pla. Dep. at 114-18].  However, after reading the email exchange she had with Dozier, she acknowledged that she missed the deadline.  [Pla. Dep. at 115-18, Ex. 15].  Plaintiff was asked and testified to the following:

23

> Q.    So apparently there was going to be a meeting that Dr. Dozier was going to be a part of on May 27, 2011, the following Friday; is that correct?
>
> A.    Yes.
>
> Q.    And so she reached out to you to provide her with the information she, the president, needs to respond to an important meeting, correct?
>
> A.    Correct.
>
> Q.    And you were asked to provide that information about a date certain the following Monday, correct?
>
> A.    Correct.
>
> Q.    So you met on Friday.  You had until Monday.  You had three days to get her the information that y'all met about, correct?
>
> A.    Yes.
>
> Q.    And you missed that deadline, correct?
>
> A.    Based on this [email], yes . . . .
>
> Q.    So you acknowledge you had a deadline, and important deadline, and you missed it, right?
>
> A.    Correct.

[Pla. Dep. at 115-17].  In addition, Plaintiff's first sentence in her email to Dozier on May 24, 2011, states: "I apologize for missing this deadline."  [Pla. Dep. at 113, Ex. 15].  Later in the deposition, it appears that Plaintiff claims that she sent at least some of the requested documents to Dozier by the deadline.  [Pla. Dep. at 118-19].  Plaintiff was then asked and testified as follows:

> Q.    If you met the deadline when you sent the documents by your phone, why are you apologizing for missing a deadline?
>
> A.    Well, that wasn't – she was the university president.  And if I missed a deadline, it was just courtesy to apologize for missing it.  But I didn't recall missing it.  It was just courtesy.

24

AO 72A

(Rev.8/8

2)

[Pla. Dep. at 119-20].  As noted *supra*, Plaintiff wrote in her email to Dozier, "I will send previously submitted documents under separate cover." [Pla. Dep. at 117-18, Ex. 15].  This statement was in the email which contained the documents that Dozier had requested.  [Id.].  In other words, the documents that Plaintiff had "previously submitted" to Dozier were not the ones that she wanted by the May 23rd deadline.  Although Plaintiff's testimony is confusing, the record evidence as a whole would not permit a reasonable jury to find that Plaintiff met the deadline imposed by Dozier.

Furthermore, even if Plaintiff was correct in her contention that she did not miss the May 23rd deadline, this fact would not establish pretext.  The relevant issue is whether the decisionmaker was giving an honest explanation for her actions.  Dozier was the person who made the decision to terminate Plaintiff's employment, and Dozier testified that she believed that Plaintiff had failed to provide her with the materials that she wanted on Monday, May 23, 2011.  There is nothing in the record which would permit a reasonable factfinder to conclude that Dozier believed that Plaintiff had actually met the deadline.  "The pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of the facts underlying that explanation without impugning the employer's honest belief, fails to create a

25

triable pretext issue." Dawson v. Henry County Police Dep't, 238 Fed. Appx. 545, 549 (11th Cir. 2007).

Plaintiff argues that pretext could also be inferred because Dozier's termination decision was not in proportion to Plaintiff's alleged failure to meet the May 23rd deadline. Plaintiff writes that Dozier's overreaction "raises an inference that Dozier fabricated or overstated the significance of this to disguise sinister motives." [Doc. 38 at 14]. This argument is not persuasive for a number of reasons. First, Dozier did not allege that she decided to fire Plaintiff based solely on one incident when she failed to meet a deadline. Dozier gave numerous reasons for the termination decision. Second, even if Plaintiff's actions on this one occasion had been the sole reason behind Dozier's termination decision, pretext could not be inferred. The evidence in the record establishes that Dozier reasonably believed that the MEAC meeting for which she was preparing on May 23, 2011, was important to SSU.[7] The meeting was Dozier's first with the MEAC, and one issue that had yet to be determined was whether SSU was going to be granted full membership in the MEAC. A reasonable employer could have found that an employee's failure to provide needed materials in a timely manner to the university president before an important meeting warranted termination.

_____

[7]Even Plaintiff acknowledged the importance of the meeting. [Pla. Dep. at 116].

AO 72A

(Rev.8/8 2)

Plaintiff's opinion that Dozier's decision to fire her was unreasonable, unwise, or out of proportion to the alleged misconduct is not relevant to the pretext inquiry. "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000). In the present case, Plaintiff has failed to rebut Defendants' proffered explanation that one of the reasons Plaintiff was terminated from her AD position was because she failed to provide important materials to President Dozier in a timely manner.

Plaintiff also argues that a reasonable jury could find that Dozier's proffered explanations for firing Plaintiff are pretexts for discrimination because basketball coach Horace Broadnax, who was appointed interim AD following Plaintiff's termination, was shocked when he learned of the termination decision. [Doc. 38 at 4, 15; PSMF ¶ 31; Dozier Dep. at 212]. Plaintiff contends that Broadnax "was in a better position to know about Suggs' job performance, and his surprise casts further doubt on Defendants' claims that her job performance was actually a problem in 2011." [Id.].

27

Plaintiff's argument is not convincing.  Contrary to Plaintiff's assertion, there is no evidence that Broadnax exhibited "public shock" at Dozier's decision to fire Plaintiff. [Doc. 38 at 4, 15].  The evidence cited by Plaintiff simply shows that Broadnax was surprised when Dozier informed him that Plaintiff had been removed as AD and that he was to assume the duties of interim AD.  [Dozier Dep. at 212-14].  Broadnax's reaction would not permit a reasonable jury to find pretext.

Moreover, the relevant issue at the pretext stage is not whether Plaintiff or another non-decisionmaker like Broadnax was surprised at the termination decision or whether they believed that Plaintiff's job performance warranted her termination.  The relevant issue is whether Dozier, the decisionmaker, gave an honest explanation for her decision to terminate Plaintiff.  The Eleventh Circuit has explained:

> The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head . . . .  The question is not whether it really was [the plaintiff's] fault that assignments were not completed on time, or whether she did delegate excessively, or whether she was aggressive and rude to her colleagues and superiors, or whether she actually lost an important document or truly did fall asleep at her desk. The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so . . . .

28

AO 72A

(Rev.8/8 2)

Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010) (citations omitted).  Because Dozier was the person who made the decision to terminate Plaintiff's employment as AD, it is not germane to the pretext inquiry whether Broadnax (or Plaintiff) believed that Plaintiff had done a good job as AD.  Broadnax's surprise at Plaintiff's termination would not permit a reasonable jury to find that Dozier had not given an honest explanation for her decision.  See Dawson, 238 Fed. Appx. at 549.

Plaintiff's final argument is that pretext can be inferred because Dozier allegedly told Plaintiff at the time of her termination that Dozier "need[ed] an athletic director with more Division I experience," yet she later selected for the AD position Sterling Steward, Jr., who had less Division I experience than Plaintiff.  [Pla. Dep. at 136; Dozier Dep. at 108, 111].  A search committee presented Dozier with the finalists for the AD position, and Dozier interviewed each of them.  [Dozier Dep. at 102-15]. Defendants note that Dozier's first choice for the AD position was Ricardo Hooper who had more Division I experience than Plaintiff.  [Dozier Dec. ¶ 6, Ex. 2; Doc. 27 at 10].  However, Dozier stated that Hooper was unavailable until 2012, so she offered the position to Steward, who was her second choice.  [Dozier Dec. ¶ 6; Dozier Dep., Ex. 13].  Steward had significantly more experience in college athletics than Plaintiff

29

AO 72A

(Rev.8/8

2)

and had worked as an interim AD/associate AD for compliance from September 2009 to July 2010 for Alabama State University, a Division I athletics program.  [Pla. Dep. at 244-45; Dozier Dep. at 110-13, Ex. 13].  Even assuming that Dozier told Plaintiff that she "need[ed] an athletic director with more Division I experience," the court concludes that a reasonable jury could not examine the record evidence and conclude that Defendants' proffered reasons for firing Plaintiff were a pretext for sexual discrimination.  [Pla. Dep. at 136].

In summary, President Cheryl Dozier asserts that Plaintiff Suggs failed to provide her with materials in preparation for a MEAC meeting in a timely manner. [Dozier Dep. at 50-53; Pla. Dep. at 113-14, Ex. 15].  Plaintiff also failed to inform Dozier that she had a mentor who was an AD from a competing MEAC university and who had helped Plaintiff respond to Dozier's request for assistance in preparing for the MEAC meeting.  [Dozier Dep. at 201-03; Pla. Dep. at 115].  In addition, Dozier testified that during her first meeting with Plaintiff on May 11, 2011, Plaintiff indicated that there had not been much fundraising and that the Athletic Department had not met the $8 million dollar budget requirement necessary to gain full membership in the MEAC.  [DSMF ¶ 8; Pla. Dep. at 124, Ex. 17; Dozier Dep. at 62-64].  Dozier claims that she made the decision to terminate Plaintiff's employment as AD because Dozier

30

felt that she could not trust Plaintiff and because Plaintiff did not posses the "leadership skills, administrative skills, budgeting skills, fundraising skills [and] the know how of interacting" that were necessary for the AD position.  [Dozier Dep. at 50-53, 205-10]. For the reasons previously discussed, the court finds that Plaintiff has not "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." McCann v. Tillman, 526 F.3d 1370, 1375-76 (11th Cir. 2008) (citations and internal quotation marks omitted). "By failing to rebut each of the legitimate, nondiscriminatory reasons of [Defendants], [Plaintiff] has failed to raise a genuine issue of material fact about whether those reasons were pretext for discrimination." Crawford v. City of Fairburn, Georgia, 482 F.3d 1305, 1309 (11th Cir. 2007).  Accordingly, the undersigned **RECOMMENDS** that Defendants' summary judgment motion [Doc. 27] be **GRANTED** on Plaintiff's Title VII and Equal Protection claims for sexual discrimination (Counts I, III).

Defendants also contend that Plaintiff's § 1983 claim against Defendant Dozier in her individual capacity fails as a matter of law because Dozier is entitled to qualified immunity.  [Doc. 27 at 28-31].  "Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation,

31

including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Foy v. Holston, 94 F.3d 1528, 1532 (11th Cir. 1996) (citing Harlow v. Fitzgerald, 102 S. Ct. 2727, 2738 (1982)).   "Qualified immunity affords 'protection to all but the plainly incompetent or those who knowingly violate the law.'" Crawford v. Carroll, 529 F.3d 961, 978 (11th Cir. 2008) (citation omitted).  A defendant invokes qualified immunity by establishing that she "was acting within the scope of [her] discretionary authority." Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009).  In the present case, Plaintiff does not dispute that Defendant Dozier was acting within the scope of her discretionary authority when she terminated Plaintiff's employment as AD.  Therefore, "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (emphasis in original).

To overcome a claim to qualified immunity, the plaintiff must demonstrate: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (citing Harlow, 102 S. Ct. at 2738); accord Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009); Case, 555 F.3d at 1326.  Plaintiff has failed

AO 72A

(Rev.8/8
2)

to show that Defendant Dozier violated a statutory or constitutional right when she terminated Plaintiff's employment as AD. As discussed *supra*, a reasonable jury could not view the evidence in the record and conclude that Dozier fired Plaintiff on the basis of her sex. Accordingly, the undersigned finds that Plaintiff is unable to carry her burden of showing that Dozier is not entitled to qualified immunity. This is an additional reason that summary judgment is appropriate on Plaintiff's § 1983 claims against Defendant Dozier in her individual capacity.

### C.   Pattern or Practice Claim

Plaintiff Suggs alleges that Defendant "SSU has a pattern and practice of gender-based discrimination, both within the athletics department and elsewhere in the University." [Doc. 1 ¶ 29]. "[I]n a pattern and practice case, the plaintiff must prove, normally through a combination of statistics and anecdotes, that discrimination is the company's standard operating procedure." EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1274 (11th Cir. 2000) (citation and internal quotation marks omitted). To satisfy this burden, the plaintiff must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." International Broth. of Teamsters v. United States, 97 S. Ct. 1843, 1855 (1977). The plaintiff must show that sexual discrimination was "the regular rather than the unusual practice." Id.

33

In support of her assertion of a pattern and practice of sexual discrimination, Plaintiff cites to the adverse employment actions taken against her, as well as Dozier's decision to hire Damon Evans as an athletics consultant and Dozier's firing of Vice President Joy Haliburton, who was replaced by a male, Philip Adams. [Doc. 38 at 17]. Plaintiff also points to SSU's alleged toleration of inappropriate comments made by Sterling Steward about females' appearance and dress. A complaint was made against Steward after he used the phrase, "Hey Beautiful." Dozier subsequently counseled Steward and instructed him not to use the phrase. [Dozier Dep. at 225-27].

The court finds that Plaintiff has not offered sufficient evidence to show that sexual discrimination against women is SSU's standard operating procedure. Plaintiff has not offered any statistics in support of her pattern or practice claim, and the few anecdotes she points to are simply inadequate to permit a reasonable jury to find in her favor. See Mathis v. Wachovia, 509 F. Supp. 2d 1125, 1142 (N.D. Fla. 2007) ("Without providing the Court with any statistical evidence of Wachovia's alleged practice of discriminatory treatment towards African Americans, it is impossible to conclude that a reasonable jury could find that Wachovia's standard operating procedure provided for racially discriminatory treatment towards black employees.").

34

Accordingly, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** on Plaintiff's Title VII pattern or practice claim.[8]

### D.    Retaliation Claim

Plaintiff next claims that Defendant Board of Regents subjected her to retaliation in violation of Title VII.  [Doc. 1, Count II].  Title VII acts to shield employees from retaliation for certain protected practices.   Specifically, the statute provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  In University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517, 2534 (2013), the Supreme Court held that a plaintiff bringing a Title VII retaliation claim "must establish that his or her protected activity was a

---

[8]The court also notes that summary judgment is warranted because Plaintiff Suggs has not brought her pattern or practice claim as a class action.  "In Davis v. Coca-Cola Bottling Co., 516 F.3d 955 (11th Cir. 2008), the Eleventh Circuit held that a private litigant cannot maintain a pattern or practice claim unless it is brought as a class action and the class is ultimately certified."  Rollins v. Alabama Community College Sys., 814 F. Supp. 2d 1250, 1316 (M.D. Ala. 2011); accord July v. Board of School Comm'rs, 291 F.R.D. 653, 657 (S.D. Ala. 2013).

AO 72A
(Rev.8/8
2)

but-for cause of the alleged adverse action by the employer." The Eleventh Circuit recently held that the burden-shifting framework set forth in <u>McDonnell Douglas</u> continues to apply after <u>Nassar</u>. <u>See</u> <u>Mealing v. Georgia Dep't of Juvenile Justice</u>, ___ Fed. Appx. ___, 2014 WL 1613206, at *5 n.9 (11th Cir. April 23, 2014).

"To make out a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in an activity protected under Title VII; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." <u>Kidd v. Mando American Corp.</u>, 731 F.3d 1196, 1211 (11th Cir. 2013); <u>accord</u> <u>Mealing</u>, ___ Fed. Appx. at ___, 2014 WL 1613206, at *5. The plaintiff "'need not prove the underlying claim of discrimination which led to [her] protest;' however, the plaintiff must have had a reasonable good faith belief that the discrimination existed." <u>Holifield</u>, 115 F.3d at 1566 (quoting <u>Tipton v. Canadian Imperial Bank of Commerce</u>, 872 F.2d 1491, 1494 (11th Cir. 1989)). The court finds that Plaintiff is able to establish the first *prima facie* element because she filed an EEOC charge of discrimination on December 27, 2011. [DSMF ¶ 39; Pla. Dep. at 191, Ex. 21]. In the charge, Plaintiff alleged that SSU terminated her from the AD position on July 5, 2011, on the basis of her sex. [Pla. Dep. at 191, Ex. 21].

AO 72A

(Rev.8/8
2)

The second *prima facie* element requires Plaintiff to prove that she suffered an adverse employment action.  "[T]he 'adverse action' test applied to retaliation claims is distinct from that applied to disparate treatment claims."  Sharpe v. Global Sec. Intern., 766 F. Supp. 2d 1272, 1291 (S.D. Ala. 2011).  The Supreme Court has held that a plaintiff bringing a retaliation claim "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern and Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2415 (2006) (citations and internal quotation marks omitted).  This standard for determining adverse actions in retaliation claims is "decidedly more relaxed" than that used in discrimination claims.  Crawford, 529 F.3d at 973.

Plaintiff Suggs argues that she suffered an adverse employment action when her position as Associate Director of Student Development ("ADSD") was changed to interim.[9]  [Doc. 38 at 9-12, 18-19].  Plaintiff claims that she first learned that her

---

[9]Defendants write that "Plaintiff may try to allege SSU's decision to hire someone else for the permanent ADSD position was retaliation."  [Doc. 27 at 27].  According to Defendants, Plaintiff cannot bring a retaliation claim based on SSU's decision to hire another candidate for the ADSD position because Plaintiff did not include this claim in her EEOC charge filed in July 2012.  [Id.].  Plaintiff, however, clarified that she "does not claim the selection of another candidate as permanent ADSD was a separate incident of retaliation" but "was the inevitable consequences of

AO 72A

(Rev.8/8

2)

position was an interim position after she filed her EEOC Charge in December 2011.
[PSMF ¶ 45].  She testified that a personnel form documenting her transfer did not
have the word "(Interim)" next to her position title when she first saw it in July 2011.
However, when she saw the document again in 2012, it read "(Interim)" next to the
position title.  [PSMF ¶ 46; Pla. Dep. 176-77, 182, 194, Ex. 20].  On the form,
"(Interim)" is in a different font from the other text, and Dozier conceded there was at
least a possibility that it was typed at a different time than "Associate Director."
[PSMF ¶ 47; Dozier Dep. 130-31, Ex. 15].  A personnel action form dated July 14,
2011, states, "Transfer from Athletics to Student Development as Interim Associate
Director, effective July 7, 2011 at an annual rate of $50,000." [Pla. Dep. at 170-90, Ex.
20].  But Plaintiff stated that when she first saw the form in July 2011, this sentence
was not on the form.  [Pla. Dep. at 170-90].

---

the facts alleged in her amended EEOC charge, i.e., the designation of her job as
interim." [Doc. 38 at 20].  As discussed *infra*, Plaintiff complained in her July 2012
EEOC charge that her ADSD position had been classified as interim.  [Pla. Dep. at
206, Ex. 23].  Because the decision to designate her position as interim is the adverse
action about which Plaintiff complains, the court finds that she was not required to
bring a separate EEOC charge after her interim position ended.  See Gregory v.
Georgia Dep't of Human Resources, 355 F.3d 1277, 1280 (11th Cir. 2004) (holding that
a "'plaintiff's judicial complaint is limited by the scope of the EEOC investigation
which can reasonably be expected to grow out of the charge of discrimination'")
(citations omitted).

AO 72A

(Rev.8/8

2)

The ADSD position was created for Plaintiff by Dr. Irvin Clark, Vice President of Student Affairs, around July 6, 2011.  [DSMF ¶ 36].  Within a few days of becoming ADSD on July 14, 2011, Plaintiff looked at her personnel file and found that the Recommendation for Employment form classified her ADSD position as "temporary."  [Pla. Dep. at 174-77].  Plaintiff's acknowledgment of this fact establishes that she knew early on that the ADSD position was not permanent, but she claims that the ADSD position was not classified as "interim" at this point.[10]  Plaintiff testified that a human resources employee, Ms. Alemayhu, informed her that a job classified as "temporary" but with no ending date "can just go on."  [Pla. Dep. at 182-84, 187, Ex. 20].  However, both President Dozier and Sandra Best, Assistant Vice President of Human Resources, testified that the terms "temporary" and "interim" are often used interchangeably at SSU and essentially mean that the position is not permanent.  [Dozier Dep. at 167-68; Best Dec. ¶ 3].

Plaintiff asserts that "temporary" and "interim" are two different designations and that she was told by Ms. Alemayhu that the terms were not the same.  [Doc. 38 at 23].  But the evidence cited by Plaintiff does not support this assertion.  Instead,

_____

[10]Plaintiff also testified that although she knew that her job was classified as temporary, she retained benefits as ADSD and that true temporary jobs do not have benefits.  [Pla. Dep. at 182-87].

AO 72A
(Rev.8/8
2)

Plaintiff testified that Ms. Alemayhu merely stated that temporary jobs with no ending date "can just go on." [Doc. 38 at 9-12, 18-19; Pla. Dep. at 182-84, 187, Ex. 20]. This does not rebut the record evidence establishing that "temporary" and "interim" are used interchangeably.

Plaintiff argues that the SSU policy regarding job codes specifies that interim positions have codes ending in "M," while the personnel form for her ADSD position had a job code ending in "X," which indicates no special designation. [Doc. 38 at 12; Dozier Dep. at 133-35, Ex. 5 at 7]. Defendants note, however, that Plaintiff testified that Paula Jackson was interim AD. [Doc. 44 at 10-11; Pla. Dep. at 54, Ex. 8 at 2]. Yet the job code used for her position ended in "X" and not "M." [Id.]. This evidence supports Defendants' contention that job codes are not used consistently at SSU. [Doc. 44 at 10-11]. Plaintiff implies that because SSU policy states that interim positions "shall normally be . . . no more than twelve months," the fact that she was in her ADSD job for a year and a half shows that it was not an interim position. [Doc. 38 at 12]. Plaintiff also notes that when she was given a six-month performance evaluation in April 2012, the evaluation form referenced goals "for the next academic year." [Dozier Dep. at 154-66, Ex. 22; PSMF ¶ 50]. The fact that Plaintiff worked in the ADSD

40

position, which she acknowledged was a temporary position, beyond the typical term of one year does not establish that the position must have been a permanent one.

The court finds that Plaintiff has failed to offer evidence which would permit a reasonable jury to conclude that she suffered an adverse employment action after she filed her December 2011 EEOC charge.  Plaintiff acknowledges that her ADSD position was classified as "temporary" shortly after she was selected for the job in July 2011.  Plaintiff knew at this point that her position was not permanent.  Furthermore, the evidence reveals that SSU used the terms "temporary" and "interim" interchangeably.  [Pla. Dep. at 174-77].  Because Plaintiff has not established that the classification of her ADSD position was changed from "temporary" to "interim," she is unable to establish a *prima facie* case of retaliation.

Assuming *arguendo* that Plaintiff suffered an adverse employment action after she filed her December 2011 EEOC charge, she would be required to establish the final *prima facie* element: a causal connection between Plaintiff's protected activity and the complained-of adverse action.  "To establish causation for purposes of a Title VII retaliation claim, the plaintiff must prove that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" Taylor v. Cardiovascular Specialists, P.C., ___ F. Supp. 2d ___, 2014 WL 1004118,

41

at *7 (N.D. Ga. March 17, 2014) (quoting <u>Nassar</u>, 133 S. Ct. at 2533).  If an employer

takes an adverse employment action against an employee shortly after becoming aware

of the employee's protected expression, then the close temporal proximity between the

two events "is generally sufficient for a plaintiff to establish but-for causation."

<u>Abernathy v. Science Applications Intern. Corp.</u>, 2013 WL 6904089, at *1 (N.D. Ala.

December 31, 2013) (citing <u>Raspanti v. Four Amigos Travel, Inc.</u>, 266 Fed. Appx. 820,

823 (11th Cir. 2008) (noting that at summary judgment the plaintiff bringing an FLSA

retaliation claim can satisfy the but-for causal relation element "if she can prove a

'close temporal proximity' between the time her employer learned about her protected

activity and her discharge")).  In <u>Clark County School Dist. v. Breeden</u>, 121 S. Ct.

1508, 1511 (2001), the Supreme Court stated that "mere temporal proximity between

an employer's knowledge of protected activity and an adverse employment action . .

. must be 'very close[.]'"

Plaintiff engaged in protected activity on December 27, 2011, when she filed an

EEOC charge of discrimination against SSU.  [Pla. Dep. at 191, Ex. 21].  Because

Plaintiff contends that the adverse action she suffered was the changing of her ADSD

position's classification to "interim," the court must next determine when the alleged

change in classification took place.  Record evidence reveals that Plaintiff was first

AO 72A

(Rev.8/8

2)

informed that her position was an interim position in June 2012, almost six months after she had filed her first EEOC charge in December 2011.

On June 18, 2012, Plaintiff's supervisor sent her an e-mail stating: "[I]t has come to my attention . . . that your name is among the list of personnel who currently hold interim positions on our campus . . . . Your position . . . is documented as interim and as a result, I will be initiating a search process to begin shortly . . . ." [PSMF ¶ 51; Dozier Dep. at 175, Ex. 24]. On July 12, 2012, Plaintiff filed a second charge of discrimination with the EEOC alleging that Defendant had subjected her to sex discrimination and retaliation. [Pla. Dep. at 206, Ex. 23]. Plaintiff asserted in the charge:

> On June 18, 2012, I was informed for the first time by SSU that it considers my current position an 'interim' position. I understand that a search committee has been formed to fill the job on a permanent basis. I was never told that this was an interim position, and I believe SSU has designated it as such in retaliation for my complaint of discrimination, in violation of Title VII.

[Pla. Dep. at 206, Ex. 23]. Although Plaintiff asserted in the July 2012 EEOC charge that less than a month before she "was informed for the first time" that her position was an interim position and that she "was never told that this was an interim position," Plaintiff claims that during her deposition a year later, in June 2013, "she was

43

reminded that she had first learned" of the interim status of her job in or around March 2012. [Doc. 38 at 9 n. 4; Pla. Dep. at 206-07]. Plaintiff testified that her supervisor, Jacqueline Awe, informed her in or around March 2012 that her position as ADSD was interim. [Pla. Dep. at 193; DSMF ¶ 40].

Regardless of whether the alleged change in classification occurred in March or June of 2012, the court finds that Plaintiff has failed to establish a but-for causal connection. Plaintiff cites to nothing other than temporal proximity to show a causal connection between her protected activity and the alleged adverse action. Although President Cheryl Dozier was the person who Plaintiff claims subjected her to sexual discrimination, Plaintiff testified that she has no evidence that Dozier had any role in deciding whether her position as ADSD was temporary or interim. [Pla. Dep. at 208-09]. Dozier knew nothing about the ADSD position except that it was in Student Affairs. [DSMF ¶ 37]. Furthermore, Dozier did not have any communications with Jacqueline Awe, Irvin Clark (the person who created the ADSD position for Plaintiff), or the search committee about conducting the search to fill the ADSD position permanently. [DSMF ¶ 46].

As noted *supra*, because Plaintiff relies upon temporal proximity alone to establish a causal connection, she must show that the proximity is "very close."

44

Breeden, 121 S. Ct. at 1511; accord Ramirez v. Bausch & Lomb, Inc., 546 Fed. Appx. 829, 832 (11th Cir. 2013) ("[A] plaintiff may be able to rely solely on the temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality, but the temporal proximity must be 'very close.'") (citation omitted).  The court finds that Plaintiff is unable to make this showing.  The Eleventh Circuit has held that a three month period between the protected activity and the adverse employment action is not sufficiently close to support an inference of a causal link.  See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) ("[T]he record reveals that Thomas has failed to produce evidence from which a reasonable jury could find a causal connection between the April 8 and 11, 2005 complaints and the July 7, 2005 termination."); Higdon v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004) ("By itself, the three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action.").  Plaintiff Suggs filed her EEOC charge on December 27, 2011, and the evidence she has presented shows that the alleged change in classification of her ADSD position to "interim" occurred in either March or June of 2012.  [Pla. Dep. at

45

193, 206, Ex. 23].  This gap of approximately three to six months would not permit a reasonable jury to find a causal connection.

In summary, Plaintiff knew that her ADSD position was classified as "temporary" in July 2011, shortly after being selected for the job.  Plaintiff filed her first EEOC charge in December 2011.  Record evidence indicates that in either March or June of 2012, Plaintiff learned that her ADSD position was classified as "interim" instead of "temporary."  Plaintiff claims that Dozier was the person who subjected her to sexual discrimination, but there is no evidence that Dozier had any role in deciding the classification of Plaintiff's ADSD position.  In light of these facts, the court concludes that a reasonable jury could not find that Plaintiff's protected activity was the "but-for" cause of the alleged adverse employment decision.  Plaintiff is unable to establish a *prima facie* case of retaliation.  The undersigned, therefore, **RECOMMENDS** that Defendants' summary judgment motion [Doc. 27] be **GRANTED** on Plaintiff's Title VII retaliation claim (Count II).

### E.    Claims for Declaratory and Injunctive Relief

Plaintiff stated in her complaint that she seeks declaratory and injunctive relief against the Board of Regents and Cheryl Dozier in her individual and official capacities.  [Doc. 1, Counts IV, V].  Plaintiff filed her complaint in this court in

46

September 2012 while she was still working at SSU, but three months later her employment ended. [PSMF ¶ 60]. Defendants argue that Plaintiff's requests for declaratory and injunctive relief are inappropriate because she is no longer employed by SSU. [Doc. 27 at 34]. The court agrees. See Wallace v. Dunn Constr. Co., Inc., 62 F.3d 374, 380 (11th Cir. 1995); Cooper v. Ambassador Personnel, Inc., 570 F. Supp. 2d 1355, 1359-60 (M.D. Ala. 2008). Moreover, even if these claims were appropriate, dismissal would be warranted because, as discussed *supra*, the court has concluded that summary judgment should be granted on all of Plaintiff's claims for discrimination and retaliation. The undersigned, therefore, **RECOMMENDS** that Defendants' summary judgment motion [Doc. 27] be **GRANTED** on Plaintiff's claims for declaratory and injunctive relief. [Doc. 1, Counts IV, V].

## IV.    Conclusion

Based on the foregoing reasons and cited authority, the undersigned **RECOMMENDS** that Defendants' motion [Doc. 27] for summary judgment be **GRANTED** on all claims asserted by Plaintiff Marilynn Stacey-Suggs.

All pretrial matters have been concluded with the issuance of this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), this Court's Local Rule

AO 72A

(Rev.8/8 2)

72.1, and Standing Order 08-01 (N.D. Ga. June 12, 2008).  The Clerk, therefore, is

**DIRECTED** to terminate the reference to the Magistrate Judge.

**SO RECOMMENDED** this 27th day of June, 2014.


JANET F. KING
UNITED STATES MAGISTRATE JUDGE

48